**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| In the Matter of the Marriage of: | No. 50159-7-II |
| ANGELA K. SCOUTTEN, n/k/a SCHREINER, | |
| Appellant, | UNPUBLISHED OPINION |
| v. | |
| MICHAEL J. E. SCOUTTEN, | |
| Respondent. | |

BJORGEN, J.P.T.[*] — Angela Scoutten, now Angela Schreiner,[1] appeals from a contempt order entered by the superior court commissioner for violations of a court ordered parenting plan.

Schreiner argues that the court erred by (1) allowing the entry of reply declarations, (2) holding the contempt hearing, (3) finding her in contempt for violating the parenting plan's residential provisions, health care provisions, and paragraph 3.10, (4) issuing the contempt order outside of her presence and without her signature, and (5) imposing sanctions. She also objects to the trial court's award of attorney fees.

We reverse the trial court's determination of contempt based on Schreiner's alleged violations of the residential and health care provisions of the parenting plan, but affirm its determination of contempt based on Schreiner's violation of paragraph 3.10 of the plan. We

---

[*] Judge Bjorgen is serving as a judge pro tempore for the Court of Appeals, pursuant to RCW 2.06.150.

[1] For the sake of clarity, we refer to her as Schreiner. No disrespect is intended.

hold against Schreiner on her remaining claims. We remand for the court to enter findings in support of its attorney fee award and to reassess the appropriate sanction and attorney fee award in light of our reversal of two of the bases for contempt.

FACTS

Schreiner was previously married to Michael Scoutten, with whom she had a daughter, M.S. After their divorce, Michael married Monica Scott, now Monica Scoutten.[2] Schreiner originally had primary custody of M.S., but on July 24, 2015, Scoutten successfully obtained a modification to the parenting plan giving him custody of M.S., with Schreiner restricted to alternating weekend visits.

Paragraph 4.2 of the parenting plan vests Scoutten with all major decision-making authority with respect to M.S.'s education and nonemergency health care, among other matters. The plan gives the parents equal authority to confer with schools on M.S.'s progress, access school records, and give parental consent while M.S. is in their respective care. The plan also empowers both parents to obtain emergency health care for M.S, but requires each to notify the other if they do so. The plan forbids Schreiner from leaving M.S. in the "care or custody of any adult other than [Schreiner's mother] or a person approved by [Scoutten]." Clerk's Papers (CP) at 190. We upheld the plan on appeal in an unpublished opinion. *In re Marriage of Scoutten v. Scoutten*, No. 48027-1, slip op. at 196 Wn. App. 1039 (Wash. Ct. App.) (October 25, 2016) (unpublished), http://www.courts.wa.gov/opinions/pdf/480271.pdf.

The week after the plan was finalized, Scoutten executed a special power of attorney, granting power of attorney to Monica whenever he is on active duty as a result of his military

---

[2] For the sake of clarity, we will refer to Michael Scoutten as Scoutten and Monica Scoutten as Monica. We intend no disrespect.

service. Through the power of attorney, Scoutten granted to Monica his decision-making authority under paragraph 4.2 of the parenting plan. He also granted Monica "full power and authority to do and perform all and every act and thing whatsoever requisite and necessary to be done in and about the premises, as fully to all intents and purposes as [Scoutten] might or could do if personally present." CP at 185.

Scoutten contends that Schreiner challenged the power of attorney in superior court where it was upheld and that Schreiner did not file an appeal. However, the superior court's order on this matter does not mention the power of attorney and instead merely confirms Scoutten's ability to continue parenting while on active duty deployment without modifying the parenting plan under RCW 26.09.260(11)-(12). The record does not show whether Schreiner had notice of the power of attorney.

One day in November 2016, Schreiner picked M.S. up from Scoutten's house to discover that M.S. had a bruise on her forehead, allegedly because Monica had thrown a cellphone at her. Schreiner took M.S. to the emergency room, and the hospital classified the case as an emergency and contacted Child Protective Services (CPS) and the Tacoma Police Department. Monica claims that Schreiner did not notify her of the emergency room visit and that the phone had merely fallen on M.S. while Monica was upstairs caring for her son (M.S.'s half-brother). CPS investigated to determine whether this was a case of domestic abuse by Monica, but ultimately found that the case was "low risk" and there was "no finding for abuse or neglect." CP at 73.

On November 27, Schreiner failed to return M.S. to Monica at the end of her visitation time. On November 28, Scoutten obtained a restraining order against Schreiner to prevent her from coming near Scoutten's home or into M.S.'s school.

On January 31, 2017, Scoutten filed a motion for contempt, alleging that Schreiner violated several provisions of the parenting plan. Scoutten alleged that (1) Schreiner failed and refused to return M.S. at the conclusion of her residential time, (2) Schreiner on multiple occasions took M.S. to the emergency room for nonurgent medical issues, such as colds, (3) Schreiner continued to make rude and derogatory comments to M.S. about Monica, causing unnecessary discord and emotional stress to M.S., and (4) Schreiner improperly interfered with M.S.'s education. Scoutten noted that Schreiner had previously been found in contempt and required to pay Scoutten's attorney fees, which she had failed to do.[3] Scoutten requested that the court sentence Schreiner to jail time in addition to paying $3,500 for attorney fees. There is no indication in the record that Scoutten submitted documentation of his attorney fees.

Scoutten also moved for the court's permission to bring M.S. on vacation with him, taking advantage of his military leave. Schreiner submitted a response declaration on February 21, 2017, asking the court to reject Scoutten's request because of her concerns about M.S. missing school. On February 24, Scoutten submitted a reply declaration rebutting Schreiner's concerns and claims, as well as a supplemental declaration by Monica in support of the contempt motion.

In their declarations, Scoutten and Monica alleged that Schreiner had been coaching M.S. to make false statements and allegations about Monica and that Schreiner had been misleading CPS and the court with respect to both her marriage dissolution and custody battle with Scoutten and the allegations of abuse by Monica. Monica's declaration identified the specific dates on which Schreiner was alleged to have failed to return M.S. at the end of her residential time. She

---

[3] The previous contempt order is not in the record before us.

also alleged that Schreiner lied to and manipulated the court at a previous hearing, at which Schreiner had denied (not under oath) being in a relationship with anyone. Monica attached with her supplemental declaration a field trip consent form from two weeks before this hearing in which Schreiner identified Brian Hutmacher as an emergency contact and M.S.'s "future Step-Father." CP at 230-31.

On February 28, the superior court commissioner heard both the contempt motion and Scoutten's request to bring M.S. on vacation, as well as a separate motion filed by Schreiner for a domestic violence protection order (DVPO) against Monica. Schreiner's attorney withdrew the DVPO issue at the outset of the hearing based on new CPS records, and the parties moved forward with the contempt motion and vacation request.

Schreiner objected to Scoutten's and Monica's February 24 declarations and asked the court to strike them, arguing that it was "fundamentally unfair" to admit them without giving Schreiner a chance to respond. Verbatim Report of Proceedings (VRP) at 4. The court noted that the only new issue raised in the declarations that was not initially pled in the contempt motion related to Schreiner's actions regarding M.S.'s schooling and determined that the parties could "deal with that at a different motion if necessary." VRP at 4. No such motion appears to have been filed.

At the conclusion of the hearing, the court sided with Scoutten on the vacation issue, but noted that it needed time to issue a written ruling on the contempt motion. The court and counsel for both parties agreed that once the court made a decision, the attorneys would draw up the order and present it ex parte. The court issued a contempt order later that day, without the signatures of either party or counsel.

5

The court made several separate findings supporting its contempt holding. First, the court found that Schreiner had violated the parenting plan's residential provisions by failing to return M.S. at the conclusion of her residential time. Second, the court found that Schreiner violated the plan's health care provisions by taking M.S. to the emergency room for nonurgent issues. The court also found that Schreiner violated the parenting plan as described in Scoutten's contempt motion, and that Schreiner "continues to provide false information to the Court." CP at 222. The court elaborated that Schreiner indicated a "future step-father" would be around M.S. after denying that any male friend would be around her, and that this man was not authorized under paragraph 3.10 of the parenting plan to have access to M.S. The court further noted that Schreiner's allegations against Monica were unsupported by CPS records and continued to undermine the bond between Scoutten and M.S. while Monica is parenting by power of attorney. CP at 222.

The court sanctioned Schreiner by imposing an indeterminate jail sentence, but suspended it subject to conditions, including that Schreiner comply with the parenting plan. CP at 224. The court also concluded that Scoutten's attorney fees were incurred and reasonable, and found that Schreiner continued to "litigate without just cause creating financial hardship on [Scoutten]." CP at 223. It accordingly entered a money judgment against Schreiner for $3,600, comprising $3,500 for attorney fees and a $100 civil penalty.

Schreiner appeals the contempt order.

## ANALYSIS

### I. REPLY DECLARATIONS

Schreiner argues that it was improper for the court to admit Scoutten's and Monica's declarations because they were not filed in accordance with local court rules.

The court has broad discretion in permitting the filing of pleadings, and a showing of prejudice is required for striking pleadings that are untimely filed. *Bargreen v. Little*, 27 Wn.2d 128, 133, 177 P.2d 85 (1947).

A.     Timeliness

Schreiner first argues the declarations were untimely because they were filed "a few days before the hearing," and therefore it was "fundamentally unfair" to admit them because they contained additional testimony beyond the original motion. Br. of Appellant at 13-14. In other words, she claims that by including additional information those declarations were not "strict" replies, and so violated Pierce County Superior Court local rules.

PCLSPR 94.04(c)(3) requires that "documents in strict reply to the motion shall be similarly filed and served no later than 12:00 noon two (2) court days prior to the hearing." At the outset we note that only Scoutten's declaration was submitted "in strict reply" per the local rules; Monica's declaration was submitted as a supplement to the underlying contempt motion. Because Scoutten's and Monica's declarations were filed four days before the contempt hearing, they were timely under Pierce County Superior Court local rules. Schreiner was given adequate notice to allow her to prepare and respond to the declarations at the contempt hearing.

With respect to Schreiner's claim that it was "fundamentally unfair" for the declarations to include additional information, a review of those declarations reveals that they were filed to rebut claims that Schreiner had made in her responsive declaration or to support claims made in the underlying motion for a contempt hearing. Specifically, Scoutten's declaration sought to rebut Schreiner's claims that M.S. was missing too much school and failing classes and that Schreiner had decision-making authority over M.S.'s education. Monica's declaration was

submitted to support Scoutten's claims in the contempt motion that Schreiner was causing unnecessary discord and emotional stress to M.S. and that she had violated the parenting plan, as well as to rebut Schreiner's previous allegations of abuse.

Although there may have been some additional information contained in the reply declarations, Schreiner had adequate notice to prepare to respond to them at the hearing. The additional declarations either rebutted claims Schreiner made in her response declaration or spoke to issues already in the record before the court. Furthermore, Monica's declaration was not filed in strict reply, but rather as a supplemental declaration to the original motion; hence Schreiner was free to respond to Monica's declaration before the hearing, in accordance with Pierce County Superior Court local rule deadlines. Schreiner cites no relevant authority to support her fairness argument. For these reasons, we reject her argument and hold that the court did not abuse its discretion.

B.      Failure to Strike

Schreiner also argues that the court erred by failing to strike Scoutten's and Monica's declarations. She bases this argument on PCLSPR 94.04(c)(1), which states that all motions shall be docketed "simultaneously with a motion and Notice of Hearing and any supporting pleadings." Schreiner contends that because Scoutten's and Monica's declarations were filed several days later, rather than simultaneously with the contempt motion, it was reversible error for the court not to strike them.

The court had broad discretion to permit the declarations, and Schreiner has not shown that she was prejudiced by the delay. *Bargreen*, 27 Wn.2d at 133. As noted above, the declarations were still filed in time to provide Schreiner with notice to allow her to prepare for the hearing. Moreover, when Schreiner's counsel objected to the declarations filed in reply and

recommended that the court strike them, the court noted that the only issue raised in those declarations that was not pled initially was Schreiner's interfering with M.S.'s schooling. The schooling issue only came to the fore after Schreiner alleged that Scoutten was misusing his leave time to bring M.S. on vacation, prompting Scoutten to respond. The court further stated that they could "deal with that at a different motion if necessary," but Schreiner evidently never filed a motion asking the court to strike the declarations. VRP at 4.

For these reasons, we conclude that Schreiner has not shown that she was prejudiced and that it was within the court's discretion not to strike the declarations.

C.      Other Claims

Schreiner baldly asserts a violation of her due process right to respond to the reply declarations under the Fourteenth Amendment to the United States Constitution and article I, section 10 of the Washington Constitution. We do not reach this argument because she has failed to provide argument or authority supporting it. RAP 10.3(6); *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

Schreiner also argues that the court erred by not ordering make up time after a finding of contempt. Upon a finding of contempt, the court shall order "[t]he noncomplying parent to provide the moving party additional time with the child." RCW 26.09.160(2)(b)(i). As Schreiner is the noncomplying parent in this case, addressing this alleged error would provide her no relief. Scoutten has declined to pursue this line of inquiry, and so do we.

## II. CONTEMPT HEARING

Schreiner makes two arguments that the court erred in holding the contempt hearing. Each argument fails.

A.      Jurisdiction

Schreiner argues that the court lacked jurisdiction to hold the hearing. Schreiner claims she never received an order to show cause and contends that Pierce County local rules require an order to show cause in order to appear before the court on a contempt charge. She also argues that because the hearing was originally scheduled to hear the DVPO issue, once she dropped that issue it was improper for the court to turn to Scoutten's contempt motion without notifying her.

Schreiner does not cite to the record or specific local court rules to support these claims, nor does she cite to any relevant legal authority to demonstrate why it was improper for the court to hold a single hearing to address two related matters where her attorney was present, did not object, and appeared capable and prepared to argue both causes. We accordingly decline to consider this argument. RAP 10.3(6); *Cowiche Canyon Conservancy*, 118 Wn.2d at 809.

B.      Right to Counsel

Schreiner also argues that she was deprived of her right to counsel because her attorney was hired to represent her in the DVPO matter, not the contempt action. Outside the purely criminal area, "the appointment of counsel is constitutionally required only when procedural fairness demands it." *Tetro v. Tetro*, 86 Wn.2d 252, 253, 544 P.2d 17 (1975). In proceedings civil in form but criminal in nature, the right to counsel "is clearly part of due process." *Id.* Hence, "wherever a contempt adjudication may result in incarceration, the person accused of contempt must be provided with state-paid counsel if he or she is unable to afford private representation." *Id.* at 255.

Although Schreiner is correct that she was entitled to counsel, her argument that she was deprived of that right fails. The right to state-paid counsel in contempt proceedings only applies if the person accused of contempt "is unable to afford private representation." *Id.* Schreiner

does not argue or show that she could not afford a private attorney. Moreover, regardless of her arguments above, her attorney did in fact competently represent her on the contempt issue. We hold that Schreiner's right to counsel was not violated.

### III. CONTEMPT FINDING

Schreiner argues that the court abused its discretion in holding her in contempt for violating the parenting plan because it misinterpreted the parenting plan and its findings were unsupported by substantial evidence. Specifically, she challenges the court's findings that she violated (1) the parenting plan's residential provisions by not returning M.S. to Monica, (2) the plan's health care provisions by taking M.S. to the emergency room, and (3) paragraph 3.10 of the plan by listing Hutmacher as M.S.'s "future step-father" on the school permission slip form.

### A. Legal Principles and Standard of Review

We review contempt rulings for an abuse of discretion. *Dep't of Ecology v. Tiger Oil Corp.*, 166 Wn. App. 720, 768, 271 P.3d 331 (2012). "'Whether contempt is warranted in a particular case is a matter within the sound discretion of the trial court; unless that discretion is abused, it should not be disturbed on appeal.'" *Moreman v. Butcher*, 126 Wn.2d 36, 40, 891 P.2d 725 (1995) (quoting *In re Pers. Restraint of King*, 110 Wn.2d 793, 798, 756 P.2d 1303 (1988)). A trial court abuses its discretion if its contempt decision was manifestly unreasonable or based on untenable grounds. *Holiday v. City of Moses Lake*, 157 Wn. App. 347, 355, 236 P.3d 981 (2010). In addition, a contempt ruling based on an erroneous view of the law or an incorrect legal analysis constitutes an abuse of discretion. *In re Estates of Smaldino*, 151 Wn. App. 356, 364, 212 P.3d 579 (2009).

We review findings of fact in a contempt order for substantial evidence. *In re Marriage of Rideout*, 150 Wn.2d 337, 351, 77 P.3d 1174 (2003). Substantial evidence exists so long as a

rational trier of fact could find the necessary facts were shown by a preponderance of the evidence. *In re Welfare of A.W.*, 182 Wn.2d 689, 711, 344 P.3d 1186 (2015). Unchallenged findings of fact are verities on appeal. *Merriman v. Cokeley*, 168 Wn.2d 627, 631, 230 P.3d 162 (2010). In determining whether the findings of fact support a conclusion of contempt, we strictly construe the order alleged to have been violated, and the facts must constitute a plain violation of the order. *In re Marriage of Humphreys*, 79 Wn. App. 596, 599, 903 P.2d 1012 (1995). The weighing of evidence and the determination of credibility is left to the trier of fact. *A.W.*, 182 Wn.2d at 711.

If a court finds that a person has failed or refused to perform an act that is within her power to perform, it may find that person in contempt of court. RCW 7.21.030(2). Contempt of court includes intentional "[d]isobedience of any lawful judgment, decree, order, or process of the court." RCW 7.21.010(1)(b).

In the context of family law proceedings such as this, there are two relevant instances where a court is required to hold a parent in contempt. First, if the court finds that a parent has made an attempt to refuse to perform a duty or hinder the other parent's performance of a duty provided in a parenting plan, it shall deem that refusal to be in bad faith and shall punish that parent by holding the parent in contempt of court. RCW 26.09.160(1). Second, if the court finds after a hearing that a parent has failed to comply with the residential provisions of a parenting plan in bad faith, "the court shall find the parent in contempt of court." RCW 26.09.160(2)(b). Bad faith is required in both cases for a finding of contempt; the difference is that a refusal to perform a duty of the parenting plan is always deemed to be in bad faith, whereas a failure to comply with residential provisions must be determined to have been in bad faith after a hearing.

When determining whether a violation warranting contempt has occurred in either of these circumstances, the trial court shall deem the parent to have the ability to comply with the parenting plan. RCW 26.09.160(4). To avoid being held in contempt for a violation of a parenting plan, a noncomplying parent must establish by a preponderance of the evidence that he or she lacked the ability to comply or had a reasonable excuse for noncompliance. *Rideout*, 150 Wn.2d at 352-53.

B.      Residential Provisions

Schreiner first argues that the court misinterpreted the residential provisions of the parenting plan and there was not substantial evidence showing that she violated them by not returning M.S. to Scoutten at the proper time. The court found:

> The parenting/custody order dated July 24, 2015 was **not** obeyed. *Angela Schreiner* did **not** obey the following parts of the parenting/custody order signed by the court on
>
>> Parenting Time Schedule by failing to return the child at the conclusion of her residential time.
>> . . . .
>
> [Schreiner] **was** able to follow the parenting/custody order. The failure to follow the order was intentional.
> . . . .
> [Schreiner] acted in bad faith.

CP at 222.

Schreiner contends that Scoutten's claim at the contempt hearing that she failed to return M.S. "on a Sunday" was insufficiently specific to warrant a finding that she actually violated the parenting plan. Br. of Appellant at 13. In Scoutten's motion for contempt hearing, he claimed that Schreiner refused to return M.S. at the conclusion of her residential time as described in Monica's declaration. Monica's declaration explicitly states that Schreiner did not return M.S. to

her on November 27, 2016. Monica also claimed that this was the second time Schreiner refused to return M.S., with the first occurring on September 20, 2015.

Hence, contrary to Schreiner's claim, there was evidence of a specific instance when she refused to return M.S. to Monica, who was fulfilling Scoutten's rights and obligations under the power of attorney.[4] The court used this evidence to find that Schreiner had the ability to follow the residential provisions of the parenting plan, but intentionally chose not to and did so in bad faith.

However, despite Scoutten's assertions to the contrary, there is no evidence in the record before us that Schreiner had actual notice of Scoutten's delegation of his parental functions to Monica through power of attorney. Scoutten claims Schreiner knew of the power of attorney because they litigated that issue in superior court, but the resulting superior court order makes no mention of a power of attorney. Rather, it makes findings under RCW 26.09.260(11) to deny Schreiner's motion for revision regarding delegation of residential time under RCW 26.09.260(12).

The parenting plan prohibits Schreiner from leaving M.S. in the care or custody of anyone other than Schreiner's mother or a person approved by Scoutten. If Schreiner had no notice of the power of attorney, then it would not have been in bad faith for her not to return M.S. to Monica while Scoutten was on leave, because she arguably would just have been following the parenting plan. The record before us does not contain evidence that Schreiner knew of the power of attorney delegating Scoutten's parental obligations under the parenting

---

[4] As noted below, we do not decide whether a power of attorney may in fact be used for this purpose.

plan to Monica. Hence, the record lacks substantial evidence supporting the court's finding that

Schreiner violated the parenting plan's residential provisions in bad faith.

Because we hold that this finding was not supported by substantial evidence based on

Schreiner's apparent lack of notice, we acknowledge but do not reach her other arguments

regarding the court's interpretation of the parenting plan or the validity of the power of attorney,

including the issue of whether a parent may delegate parental responsibilities under a court-

ordered parenting plan through a power of attorney.[5]

C.      Health Care Provisions

Schreiner next argues that the court erred by finding that she violated the provision

relating to M.S.'s health care by taking M.S. to the emergency room for nonurgent medical

issues. The court found:

> The parenting/custody order dated July 24, 2015 was **not** obeyed. *Angela Schreiner*
> did **not** obey the following parts of the parenting/custody order signed by the court.
> . . . .
>> Decision-making by taking the child to the Emergency Room for non-
>> urgent medical issues.
>> . . . .
>
> [Schreiner] **was** able to follow the parenting/custody order. The failure to follow
> the order was intentional.
> . . . .
> [Schreiner] acted in bad faith.

CP at 222.

The parenting plan provides that both parents are authorized to "obtain emergency health

care for the child without the consent of the other parent." CP at 195. Schreiner argues that even

if the incident was not an emergency, the parenting plan does not explicitly forbid her from

---

[5] These arguments include issues 1, 2, 3, 4, and 5 in Schreiner's issues pertaining to assignments
of error, as well as her argument on page 7 of her brief.

taking M.S. to the emergency room for a "non-emergency." Br. of Appellant at 24. This contention is wrong; the parenting plan explicitly grants Scoutten sole decision-making authority over nonemergency health care; Schreiner is authorized to obtain emergency health care only.

Schreiner also contends that she took M.S. to the emergency room because M.S. claimed Monica had thrown a cell phone at her head, causing a bruise. Hence, Schreiner argues, she was within her rights to obtain emergency health care for M.S. because she believed there was an emergency.

Scoutten counters, through Monica's declaration, that this was in bad faith because CPS ultimately found that the case was "low risk" and there was "no finding for abuse or neglect." CP at 73. Monica also claimed that the phone had simply fallen on M.S.'s head while Monica was upstairs caring for her son. But as Schreiner points out, CPS investigated the incident because the hospital classified the case as an emergency and contacted CPS and the Tacoma Police Department. Schreiner essentially argues that, even if she technically violated the order by bringing M.S. to the emergency room for a nonemergency, it was not in bad faith because she reasonably believed the incident was an emergency at the time.

The court did not specify on what grounds this finding supported contempt. We conclude that the court interpreted this incident as an intentional disobedience of a lawful court order under RCW 7.21.010(1)(b) and analyze it under that provision. Hence, holding Schreiner in contempt based on this finding was a discretionary decision of the court based on Schreiner's alleged intentional disobedience of the court-ordered parenting plan. The pertinent inquiry, therefore, is whether substantial evidence supported a finding that Schreiner intentionally disobeyed the provision reserving all nonemergency health care decisions to Scoutten.

We hold that this finding was not supported by substantial evidence. Even if we accept Monica's version of events and do not rely on Schreiner's, the record shows that M.S had a bruise on her forehead that was caused by a cell phone falling off a table and onto her. The record shows that Schreiner took her daughter to the emergency room for that bruise and the incident ultimately was found not to be serious, but it is not clear how severe the bruise looked at the time or what caused it. Although the court found that Schreiner took M.S. to the emergency room "for non-urgent medical issues," the court had the benefit of hindsight not available to a concerned mother caring for a potentially injured child.

We are left, on this record, with a mother taking her child to the emergency room for a bruise on the child's head of unknown severity. Even deferring to the court's weighing of evidence and determinations of credibility, this evidence does not support a finding that Schreiner intentionally disobeyed the parenting plan in bad faith by obtaining emergency medical treatment for her child in these circumstances. *See A.W.*, 182 Wn.2d at 711. This finding is not supported by substantial evidence.

D.    Paragraph 3.10

Schreiner also objects to the court's finding that she violated paragraph 3.10 of the parenting plan by listing Hutmacher as an emergency contact and as M.S.'s "future Step-Father" on a school permission slip. Br. of Appellant at 26-27; CP at 230-31. The court found:

> Angela Schreiner continues to provide false information to the court. School records indicate on a contact list that a man described as "future step-father" would be around the child after denying any male friend would be around the child. Additionally the records show that she was willing to allow a person not authorized under paragraph 3.10 to have access to the child.
> . . . .
> [Schreiner] **was** able to follow the parenting/custody order. The failure to follow the order was intentional.
> . . . .
> [Schreiner] acted in bad faith.

17

CP at 222.

Scoutten asked the court to hold Schreiner in contempt in part because she had previously come before the court and stated that she was not in a relationship with anyone who would be spending time with M.S., when just two weeks prior she had put down another man, Hutmacher, as M.S.'s "future Step-Father" and emergency contact on the school permission slip.  CP at 217-18.  Schreiner argues that because she was not under oath when she denied having a significant other that might be spending time with M.S., she cannot be found in contempt for lying to the court.

We stress that the absence of an oath does not relieve an individual of the consequences of lying to the court.  However, we need not address that issue because Schreiner's alleged false statement about Hutmacher was not the only basis for the court's finding that she violated the parenting plan.  The violation of paragraph 3.10 stemmed from her listing Hutmacher as M.S.'s future stepfather and emergency contact for M.S.'s school, which the court interpreted as suggesting that Schreiner was allowing someone to have access to M.S. who was not authorized by the parenting plan.

Schreiner argues that the parenting plan does not prevent her friends or family from having contact with or access to M.S.  Paragraph 3.10 of the plan merely forbids her from leaving M.S. "in the care or custody of any adult" other than Schreiner's mother or a person approved by Scoutten.  CP at 190.  She contends that because there was no evidence that she had actually left M.S. in the care of Hutmacher, there could not have been a violation of that provision.

However, the fact that Schreiner listed Hutmacher as an emergency contact and "future step-father" on the permission slip certainly suggests that she is leaving M.S. in his care.  After

all, should an emergency arise during a field trip, one would expect the listed emergency contact to be responsible for caring for a child affected by that emergency. Moreover, it would be reasonable for a trier of fact to conclude that someone identified as M.S.'s "future step-father" would from time to time have her in his care or custody.

We defer to the trial court on its weighing of evidence and determinations of credibility. *A.W.*, 182 Wn.2d at 711. A rational trier of fact could have found by a preponderance of the evidence that Schreiner was leaving M.S. in the care of someone not authorized by paragraph 3.10 of the parenting plan. *Id.* We accordingly hold that substantial evidence supports this finding.

It is unclear from the contempt order whether the court held Schreiner in contempt under RCW 7.21.010 or RCW 26.09.160.[6] However, this violation of the parenting plan was a proper basis for finding contempt under either statute. If the court found that Schreiner refused to perform her duty under the parenting plan to not leave M.S. in the care or custody of someone not authorized by the parenting plan, it was required to deem that refusal to be in bad faith and punish Schreiner by holding her in contempt. RCW 26.09.160(1). If the court instead found that Schreiner intentionally failed or refused to perform an act that was within her power to perform, it was permitted to find her in contempt of court. RCW 7.21.030(2). Contempt of court includes intentional "[d]isobedience of any lawful judgment, decree, order, or process of the court," which would include a provision of a court-ordered parenting plan. RCW 7.21.010(1)(b).

Because substantial evidence supported the finding that Schreiner was leaving M.S. in the care or custody of someone not authorized by the plan, it was within the court's discretion to

---

[6] The contempt order simply identifies "RCW 26.09.160, 7.21.010" in the footer of each page of the order.

hold her in contempt for this violation under either statute. *See Moreman*, 126 Wn.2d at 40. We accordingly uphold the court's determination of contempt on this basis.

IV. PRESENTATION AND SIGNING OF CONTEMPT ORDER

Schreiner argues the court erred by not allowing her to be at the hearing for the contempt order or review the order before presentation. She cites PCLSPR 94.04(c)(8), which states that

> attorneys and self-represented parties shall have proposed orders prepared for presentation to the court at the time of the hearing . . . at the conclusion of the motion and shall remain in attendance in the court until the appropriate order(s) has been signed by counsel, all parties, and the court.

Schreiner reasons that because the contempt hearing ended and the parties left the courtroom without a completed written order, the court violated PCLSPR 94.04(c)(8).

Schreiner ignores the fact that the court had yet to rule on the motion for contempt, so there had been no "conclusion" of the motion when the hearing adjourned. *See* PCLSPR 94.04(c)(8). The court adjourned to consider its ruling on the motion and directed the attorneys for both parties to draw up the proposed order and present it later ex parte. Hence, the "conclusion of the motion" occurred when the court made its decision and signed the contempt order drawn up by the parties. *See* PCLSPR 94.04(c)(8). Excusing the parties at the end of the hearing was not a violation of court rules.

Schreiner also contends that it was error not to notify her to come to the presentation of the order and provide her an opportunity to sign or object to it. For all family law motions, PCLSPR 94.04(c)(8) requires attorneys to remain in attendance in the court from the conclusion of the motion until signature, but does not require the same of the parties unless they are self-represented.

Even if we assume without deciding that it was error for the court to not have Schreiner sign the contempt order, Schreiner has not shown that she was at all prejudiced. *See Thomas v.*

*French*, 99 Wn.2d 95, 104, 659 P.2d 1097 (1983) ("[E]rror without prejudice is not grounds for reversal.").  Schreiner's own attorney worked with Scoutten's attorney to draw up the order and present it to the court.  Schreiner has not alleged that she lacked notice that she was being found in contempt, and the cooperation of her attorney suggests that she was aware of the order and acquiesced to the court's authority to issue it.  We conclude Schreiner was not prejudiced, and her argument fails.

## V.  SANCTIONS

Schreiner argues the court erred by issuing punitive sanctions for contempt, instead of remedial sanctions.  We disagree.

### A.      Legal Principles and Standard of Review

"'Punishment for contempt of court is within the sound discretion of the judge so ruling.  Unless there is an abuse of a trial court's exercise of discretion, it will not be disturbed on appeal.'"  *Schuster v. Schuster*, 90 Wn.2d 626, 630, 585 P.2d 130 (1978) (quoting *State v. Caffrey*, 70 Wn.2d 120, 122-23, 422 P.2d 307 (1966)).

Washington law distinguishes between punitive and remedial sanctions for contempt.  *State v. Hobble*, 126 Wn.2d 283, 292, 892 P.2d 85 (1995).  A punitive sanction is "imposed to punish a past contempt of court for the purpose of upholding the authority of the court."  RCW 7.21.010(2).  A remedial sanction is "imposed for the purpose of coercing performance when the contempt consists of the omission or refusal to perform an act that is yet in the person's power to perform."  RCW 7.21.010(3).

A court may impose a remedial sanction on the motion of a person aggrieved by a contempt of court in the proceeding to which the contempt is related.  RCW 7.21.030(1).  If the court finds that one "has failed or refused to perform an act that is yet within the person's power

to perform," it may impose a term of imprisonment. RCW 7.21.030(2)(a). The court may also order the person found in contempt to pay the other party for any losses suffered by that party as a result of the contempt and any costs incurred in connection with the contempt proceeding, including reasonable attorney fees. RCW 7.21.030(3).

B.      Punitive vs. Remedial Sanctions

Schreiner's conclusory contention that the court imposed punitive sanctions rather than remedial sanctions is mistaken. Contrary to Schreiner's assertion, the sanctions issued here were not "imposed to punish a past contempt of court." RCW 7.21.010(2). Instead, the court-imposed sanctions to coerce Schreiner to perform the acts required of her in the parenting plan after a showing that she had failed or refused to do so. RCW 7.21.010(3). This included her failure to obtain Scoutten's approval before leaving M.S. in the care of someone not authorized by the plan. The imposition of an indeterminate, suspended jail sentence was clearly intended to coerce Schreiner to comply with the parenting plan in the future, as the suspension of the sentence was conditioned on Schreiner obeying the terms of the plan, among other conditions. We conclude that the sanctions were remedial, not punitive.

Schreiner also reiterates her attorney's argument that the indeterminate suspended jail sentence was improper because it essentially sentenced her to jail time for unpaid attorney fees. Although Scoutten asked the court to impose a jail sentence based on Schreiner's refusal to pay attorney fees associated with the previous contempt finding, this was not the basis on which the court ordered the indeterminate, suspended jail sentence. As the court pointed out, Schreiner may be sentenced to jail time for other violations, such as failing or refusing to comply with the parenting plan. RCW 7.21.030(2). Indeed, the contempt order stated that Schreiner's suspended

22

jail sentence was issued "for violation of the parenting plan" and made no mention of attorney fees within that provision. CP at 224. This argument fails.

For these reasons, we hold that the court did not abuse its discretion in imposing remedial sanctions.

ATTORNEY FEES

The court awarded Scoutten attorney fees associated with the contempt proceeding. Schreiner argues the calculation of the award was improper because Scoutten provided no argument or documentation in support of his proposed attorney fees.

RCW 26.09.160(2)(b)(ii)-(iii) provides that the trial court, upon a finding of contempt, "shall" order the noncomplying parent "to pay, to the moving party, all court costs and reasonable attorneys' fees incurred as a result of the noncompliance, and . . . a civil penalty, not less than the sum of one hundred dollars." Hence, in this contempt action it was mandatory for the court to order Schreiner to pay attorney fees and a civil penalty to Scoutten. *See In re Marriage of Myers*, 123 Wn. App. 889, 893, 99 P.3d 398 (2004).

Schreiner disputes the amount of the fee award. While the imposition of attorney fees in this case is mandatory, the amount is within the trial court's discretion. *In re Parentage of Schroeder*, 106 Wn. App. 343, 353, 22 P.3d 1280 (2001). Any attorney fees awarded for contempt proceedings must relate to the costs of bringing those proceedings, not some prior proceeding. *Id*. at 353-54.

In reviewing the trial court's decision for an abuse of discretion, we determine whether it was manifestly unreasonable or clearly untenable. *In re Marriage of Obaidi & Qayoum*, 154 Wn. App. 609, 617, 226 P.3d 787 (2010). "To withstand appeal, a fee award must be accompanied by findings of fact and conclusions of law to establish a record adequate for

23

review." *Eagle Point Condo. Owners Ass'n v. Coy*, 102 Wn. App. 697, 715, 9 P.3d 898 (2000). "If the trial court does not make findings of fact and conclusions of law supporting the attorney fees award, the preferred remedy is to remand to the trial court for entry of proper findings and conclusions." *White v. Clark County*, 188 Wn. App. 622, 639, 354 P.3d 38 (2015).

There is no indication in the record that Scoutten provided any evidence of the attorney fees he incurred to support his request for $3,500 in attorney fees at the contempt hearing. Nor is there an indication that the court properly separated his fees associated with the contempt hearing from his fees incurred elsewhere in litigation with Schreiner. The court found simply that his attorney fees were reasonable and in fact incurred, and noted that Schreiner "continues to litigate without just cause creating financial hardship on [Scoutten]." CP at 223. We hold that the court's findings constitute an inadequate record for review, and remand to the court for entry of proper findings. *See White*, 188 Wn. App. at 639.

Scoutten also asks for attorney fees associated with this appeal, pursuant to RAP 18.1(b). On appeal, the appellate court may, in its discretion, order a party to pay for the cost to the other party of maintaining the appeal and attorney fees. RCW 26.09.140.

Scoutten makes no argument apart from a bare assertion that he "should be provided with some relief from all the attorney's fees and costs he has been forced to incur because of not only the contemptuous behavior by Ms. Schreiner but her continued abuse of the judicial process as well." Suppl. Br. of Resp't at 6. RAP 18.1(b) requires more than this "bald request" for attorney fees on appeal; it requires argument and citation to authority to advise us of the appropriate grounds for an award of attorney fees and costs. *Bay v. Jensen*, 147 Wn. App. 641, 661, 196 P.3d 753 (2008). We accordingly reject Scoutten's request for attorney fees on appeal.

CONCLUSION

We reverse the court's ruling of contempt with respect to Schreiner's alleged violations of the parenting plan's residential and health care provisions. We affirm the court's ruling of contempt with respect to Schreiner's violation of paragraph 3.10 of the plan. We otherwise affirm the order but remand for entry of findings supporting the attorney fees calculation. On remand, the court shall reevaluate the appropriate sanction for contempt and the attorney fee award in light of our decision reversing two of the bases for contempt.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Bjorgen, J.P.T.

We concur:

Lee, A.C.J.

Sutton, J.